**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | **Case No. 1:17-cv-04665-FB-SJB** |
| ) | |
| ) | |
| ) | **CONSOLIDATED AMENDED CLASS** |
| In re SEQUANS COMMUNICATIONS S.A. ) | **ACTION COMPLAINT** |
| SECURITIES LITIGATION ) | |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| ) | |
| ) | |
| ) | |

Lead Plaintiffs Kulwant Johal and Matthew McGee ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Amended Class Action Complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sequans Communications S.A. ("Sequans" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a Class consisting of all persons other than Defendants who purchased or otherwise acquired Sequans' American Depositary Receipt shares ("ADRs") between April 29, 2016 through July 31, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by the Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its Chief Executive Officer and Chief Financial Officer.

2.      Sequans Communications SA is a fabless designer, developer and supplier of 4G semiconductor solutions for wireless broadband applications.  The Company's solutions incorporate baseband processor and radio frequency, or RF, transceiver integrated circuits, or ICs, along with its proprietary signal processing techniques, algorithms and software stacks.  Founded in 2003, the Company is headquartered in Paris, France.  Sequans' ADRs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SQNS."

3.      Throughout the Class Period, Sequans repeatedly misled investors about its revenue recognition practices.  Specifically, Sequans affirmatively misrepresented that "products are not sold with the right of return."  However, unbeknownst to investors and contrary to its stated policy, Sequans provided a customer which incorporated its products into tablets sold to Walmart the ability to return purchased products for which Sequans had already booked revenue, and had not taken any reserve even though collection was uncertain and return likely.  While Sequans told investors that the tablet-related products were sold pursuant to "firm" purchase orders in "early 2016," the account of the Company's Vice President of Sales –Americas from June 2014 to January 2017 ("Former VP"), demonstrates that these representations were false.  The Former VP explained that (a) Sequans entered into deals with an original equipment manufacturer, Yifang,

2

whereby Yifang would purchase from Sequans communications modules to be included in electronic tablets Yifang would manufacture for Best Buy and Walmart; (b) Sequans understood that the modules might be returned, (c) Sequans knew by the end of the first quarter of 2016 that the modules would likely be returned because, by that time, both Best Buy and Walmart had cancelled their tablet orders, and (d) Sequans delayed accepting returns of the modules to avoid recording a liability or expense, from at least the second half of 2016 until the Former VP left the Company in January 2017.

4.     In addition, facts recently admitted by Defendants demonstrate that they knew that they might accept a return of the products, and of uncertainties regarding collectability of the tablet-related revenues by the end of the first quarter of 2016.  As Defendants Georges Karam ("Karam"), Deborah Choate ("Choate"), and Sequans expressly admitted at the end of the Class Period, the customer had not paid for the order, and sales of the tablet at Walmart were weak. Although Defendants knew this in 2016, instead of coming clean with investors, the Company secretly "spent a long time trying to find a solution" regarding the returned product, eventually finding another customer that would repurpose some but not all of the returned product in a separate device it intended to be certified and sold by Verizon Wireless.

5.     Even though Defendants knew at the time of the materially false and misleading statements that collection of the tablet-related sales was uncertain and that its customer could not pay for the products due to weak sales to Walmart of the finished tablet product, they failed to comply with simple and obvious accounting rules that required Sequans to either delay recognition of the tablet revenue until the question of return was resolved, or to take an appropriate reserve against revenue to reflect the possibility of return.  Instead, Defendants repeatedly told investors that the Company's sales were firm, without a right of return.

6.      In addition to inflating Class Period financial results through these accounting improprieties, Defendants Karam and Choate falsely certified that the Company's financial statements were prepared in accordance with generally accepted accounting principles, SEC regulations, and the internal control framework established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").  Defendants further falsely stated that the Company's internal control over financial reporting was effective, failing to disclose that Sequans had material weakness in crucial internal controls governing revenue recognition.

7.      On May 2, 2017, Defendants also provided a materially false and misleading financial outlook for the second quarter of 2017.  They inflated projections by excluding any impact from the Yifang debacle, even though they knew that collection from Yifang was highly uncertain and a return charge likely.

8.      On August 1, 2017, Defendants ultimately conceded that the tablet-related products had been returned, and that the Company would reduce revenue for the second quarter of 2017 by $740,000 as a result of the return.  On this news, Sequans' ADR price fell $0.67, or 18.21%, to close at $3.01 on August 1, 2017.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions, and subsequent damages, took place within this judicial district. Sequans sponsors ADRs that are traded in this District, and the materially false and misleading information at issue was disseminated in this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Lead Plaintiff Kulwant Johal, as set forth in his Certification, *see* Dkt. No. 11-2, purchased Sequans' securities at artificially inflated prices during the Class Period and was damaged as a result of the disclosure of federal securities laws violations alleged herein.

15.     Lead Plaintiff Matthew McGee, as set forth in his Certification, *see id.*, purchased Sequans' securities at artificially inflated prices during the Class Period and was damaged as a result of the disclosure of federal securities laws violations alleged herein.

16.     Defendant Sequans is headquartered in Paris, France, and its principal executive offices are located at 15-55 Boulevard Charles de Gaulle, Paris 92700, France.  Sequans' securities trade on the NYSE under the ticker symbol "SQNS."

17.     Defendant Karam founded and has served as the Company's Chief Executive Officer ("CEO"), President and Chairman since 2003.  Karam signed the Company's 2015 and

2016 Annual Reports on Form 20-F, and signed the certifications attached to those reports pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

18.     Defendant Choate has served as the Company's Chief Financial Officer ("CFO") since July 2007.  Choate signed the certifications attached to the Company's 2015 and 2016 Annual Reports on Form 20-F pursuant to SOX.

19.     Defendants Karam and Choate are sometimes referred to herein as the "Individual Defendants."

20.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

21.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Revenue Recognition under IFRS Standards

22.     In its SEC filings during the Class Period, Sequans explains that it prepares its annual financial statements in accordance with the International Financial Reporting Standards ("IFRS"). IFRS standards are generally accepted accounting standards promulgated by the International Accounting Standards Board ("IASB").  IFRS standards are widely issued by many public companies with their principal place of business in European countries.  IFRS standards largely incorporate the International Accounting Standards ("IAS") except to the extent that the IFRS standards differ from IAS standards.

23.      IAS 18, which is incorporated into the IFRS standards, outlines the requirements for recognizing revenue from the sale of goods or services.  Pursuant to IAS 18.14, revenue from

the sale of goods can be recognized only when (1) the seller "has transferred to the buyer the significant risks and rewards of ownership," (2) the seller "retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold," (3) "the amount of revenue can be measured reliably," (4) "it is probable that the economic benefits associated with the transaction will flow to the [seller]," and (5) "the cost incurred or to be incurred in respect of the transaction can be measured reliably." *See* IAS 18, par. 14.

24.     In cases where the seller offers a refund to the customer, IAS 18 allows the recognition of revenue only when the seller can reliably estimate future returns. For instance, if the seller offers a refund, revenue may be recognized "provided the seller can reliably estimate future returns and recognizes a liability for returns based on previous experience and other relevant factors." *See* IAS 18, par. 17.

25.     Moreover, IAS 18 requires that "when an uncertainty arises about the collectability of an amount already included in revenue, the uncollectable amount or the amount in respect of which recovery has ceased to be probable is recognized as an expense, rather than as an adjustment of the amount of revenue originally recognized." *See* IAS 18, par. 18.

26.     Pursuant to SEC Regulation 15D § 240.15d-15(e)-(f), a foreign private issuer like Sequans is required to establish and maintain disclosure controls and procedures and internal controls over financial reporting in a manner that "provides reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorization of management and directors of the issuer." *See* 17 CFR 240.15D-15(f). In Annual Reports filed on Form 20-F for the years 2015 and 2016 on April 29, 2016 and March 31, 2017, respectively, both Karam and Choate made such certifications.

27.     In Annual Reports filed on Form 20-F for the years 2015 and 2016, Defendants also falsely asserted that the Company's internal controls over financial reporting complied with the criteria set forth by COSO, a joint initiative of several private organizations that seeks to provide a standardized framework for enterprise risk management, internal control and the prevention of fraud.  The COSO internal control framework is designed to specifically address the risks of misstatements in a Company's financial statements.

28.     The COSO internal control framework consists of five components, which include control environment, risk assessment, control activities, information and communication and monitoring activities.  In particular, the control environment is "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization. The board of directors and senior management establish the tone at the top regarding the importance of internal control and expected standards of conduct."  *See* COSO Framework, Ch. 2.[1]

29.     The COSO internal control framework requires senior management to assess risk factors that may render internal control over financial reporting ineffective, and senior management is responsible for communicating throughout the organization that control responsibilities must be taken seriously, and monitoring activities to ensure that all components of the COSO internal control framework are present and functioning.

## Background

30.     Sequans is a fabless designer, developer and supplier of LTE (4G) semiconductor solutions for wireless broadband applications and other mobile electronic products. The Company's LTE solutions include baseband processor and radio frequency transceiver integrated circuits along with proprietary signal processing techniques, algorithms and software stacks.  Some

---

[1] *See* https://www.coso.org/Pages/ic.aspx.

of its solutions are incorporated into electronic tablets.  For example, both Sequans' 2015 and 2016 Annual Reports indicated that its products are used to power "the eFun Nextbook Ares 8L and Ares 10L tablets available at Walmart."  These tablets are, respectively, 8" and 10" tablets running the Lollipop version of the Android operating system.  *See* https://www.androidcentral.com/e-fun-unveils-four-new-additions-its-nextbook-ares-series-tablets.  The eFun notebook is produced by Yifang, an electronics manufacturer based in Hong Kong, China.

31.     The eFun Netxbook tablets were material to Sequans' business. Indeed, Defendants Karam and Sequans deemed the eFun Nextbook tablets so important to Sequans that when the tablets were launched in September 2015, they issued a press release announcing the rollout.  In the press release, Defendant Karam stated:

> "The E FUN Nextbook tablets are excellent devices with powerful capabilities and yet affordable for the mass market," said Georges Karam, Sequans CEO. "I believe the smart combination of attractive tablet functionality, the built-in, always-connected power of Verizon's 4G LTE network, and excellent affordability will give them immediate consumer acceptance and we are very pleased to see them made available everywhere in the U.S. by the world's largest retailer."

32.     In early 2016, Sequans booked at least $740,000 in revenues for a large tablet-related sale, that was related to the eFun Nextbook Ares tablets.  Lead Plaintiffs base this allegation on the fact that Sequans has specified the products that were ultimately destined for Walmart, and Sequans has only mentioned Yifang's eFun Nextbook Ares 8L and Ares 10L as Sequans-powered tablets that are sold at Walmart.  At the time, these tablets were already becoming obsolete.  In particular, the version of Android they utilized, Android Lollipop, had been replaced by a newer version called Android Marshmallow released on October 5, 2015.

33.     Throughout the Class Period, Sequans was aware of uncertainty regarding collectability of the revenues from the sale to Yifang.

34.     The Former VP helped the Company sell modules for eFun tablets sold to Best Buy, and knew about the eFun tablets destined for Walmart.  In the middle of 2015, he created a forecast that Best Buy would purchase approximately 1,000 tablets a month for over a ten month run, each of which required one Sequans module.  Although Sequans internally forecast that Best Buy would purchase no more than 10,000 modules, it shipped at least 30,000 modules to Yifang for use in the Best Buy tablets.  According to the Former VP, Sequans shipped more than what was demanded at the time, and what was forecast by the Company internally with the understanding that if sales were disappointing, Sequans would accept returns.  The Former VP understood that Sequans had a virtually identical deal with Yifang with respect to modules for the Walmart tablets.

35.     The Former VP states that Best Buy initially placed an order for 700 tablets to be delivered by August 2015 for the holiday season, and Walmart also placed an order for tablets to be delivered in 2015.  Due to technical challenges at Yifang not associated with the Sequans modules, the tablets could not be shipped to Best Buy or Walmart before the important holiday season at the end of 2015.  According to Sequans' Former VP, Walmart cancelled tablet orders when it learned that Yifang could not deliver them all before the first quarter of 2016.  Best Buy also cancelled the tablet program in the first quarter of 2016 because demand was extremely low.

36.     Based on conversations with Defendant Karam, the Former VP understood that Yifang could return unused modules to Sequans.  Absorbing the returns, however, would undermine the Company's ability to meet earnings guidance because the returns would have to be expensed against income. For this reason, the Company sought to find new buyers for the modules rather than accepting returns, beginning at the end of the second quarter of 2016.  Defendant Karam regularly told the Former VP to find another buyer for the modules sold to Yifang for the Best Buy

tablets. The Former VP understood that the Company undertook similar efforts with respect to modules for the Walmart tablets.

37.     Sequans' Former VP explained that, in an effort to avoid recording a liability for returns or an expense for uncollectable receivables in its financial statements, Sequans convinced Yifang to retain the modules for as long as possible.  This allowed Sequans to look for a new buyer and defer the financial impact of a return until the Company was in a better position to absorb the loss.  To his knowledge, these practices began in the second quarter of 2016 and continued until the Former VP left the Company in January 2017.

38.     The Former VP described Defendant Karam as a micromanager who was deeply involved in the Company's day to day business, and knew intricate details about the business better than anyone else at the Company.  He heard Defendant Karam state that certain aspects of the Company's revenue recognition practices should not be reported to Defendant Choate because Choate may object and prevent the Company from improperly delaying a major loss from one quarter to the next.

39.     While Sequans continues to conceal when it first learned that collectability for the tablets was uncertain, the following corroborating facts demonstrate, as the Former VP has confirmed, that Sequans knew that collectability was uncertain by the end of the first quarter of 2016.  At that point, (a) the customer had not fulfilled its payment obligations; (b) sales of the tablets were weak, and the products were harshly criticized by customer reviews on Walmart's website;[2] (c) the tablets were already obsolete; (d) the Company admitted it "spent a long time"

---

[2] For example, a March 15, 2016 review gave the Ares 8L tablet the lowest one star rating, calling it "horrible" and "by far the worst experience ever."  Another early 2016 review warned "Not worth it!  Don't buy!"  *See* https://www.walmart.com/ip/Nextbook-8-Quad-core-Verizon-4g-Lte-Tab/43266551.

trying to find a new customer for the returned modules before coming clean with investors; and (e) even after finding a new customer for a fraction of the modules, Sequans further delayed disclosure while the new customer redesigned a device to accept the returned modules, and had the redesigned device certified by Verizon Wireless, a complex and lengthy process.

**Materially False and Misleading Statements Issued During the Class Period**

40.     The Class Period begins on April 29, 2016, when Sequans filed an Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015. As a foreign private issuer, Sequans files Annual Reports regarding the Company's operations and financial conditions on SEC Form 20-F.  The 2015 20-F was signed by Defendant Karam. The 2015 20-F also contained signed certifications pursuant to SOX by the Individual Defendants stating that the financial information contained in the 2015 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

41.     In the 2015 20-F, the Company stated the following with regards to revenue recognition of products:

*Product revenue*

Substantially all of the Company's product revenue is derived from the sale of semiconductor solutions for 4G wireless broadband applications.

***Revenue from the sale of products is recognized when the significant risks and rewards of ownership of the goods have passed to the buyer and when no continuing managerial involvement to the degree usually associated with ownership nor effective control over the sale of products is retained, which usually occurs on shipment of the goods. Products are not sold with a right of return but are covered by warranty.*** Although the products sold have embedded software, the Company believes that software is incidental to the products it sells.

(Emphasis added).

42.     These statements were materially false and misleading when made because: (a) Sequans recognized revenue while it maintained managerial involvement to the degree usually associated with ownership, (b) Sequans sold products with a right of return, and (c) the statements omitted that Sequans' revenue recognition practices violated IAS 18 by recognizing revenue where collectability is uncertain, and by recognizing revenue from sales subject to a right of return without being able to reasonably assess the amount of returns or reserving for such returns.

43.     The 2015 20-F also contained the following materially false and misleading statements regarding the Company's internal controls:

> Our management is responsible for establishing and maintaining adequate internal control over our financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, the company's principal executive and principal financial officers and effected by the company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS and includes those policies and procedures that:
>
> . . .
>
> • Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company . . .
>
> . . .
>
> Our management assessed the effectiveness of our internal control over financial reporting, as of December 31, 2015. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (2013 Framework).
>
> Based on our assessment, management believes that as of December 31, 2015 our internal control over financial reporting is effective based on these criteria.

44.     These statements were materially false and misleading when made because (a) Sequans had not implemented internal controls to cause revenue to be recognized only when permitted by IFRS; (b) Sequans' internal control over financial reporting was not effective with respect to revenue recognition; and as a result (c) Sequans' financial statements did not comply with SEC Regulation 15D or the COSO internal control framework.

45.     On June 30, 2016 and September 30, 2016, Sequans announced in press releases the Company's financial results for the second quarter and third quarter of 2016 respectively.   In these press releases, Sequans did not book any reserve for potential returns associated with the module sales to Yifang, and did not recognize any expense to reflect that collectability had become uncertain with respect to previously booked revenues from the module sales to Yifang.

46.     On March 31, 2017, Sequans filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016. The 2016 20-F was signed by Defendant Karam.   The 2016 20-F also contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2016 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     The 2016 20-F stated the following with regards to revenue recognition of products:

*Product revenue*

Substantially all of the Company's product revenue is derived from the sale of semiconductor solutions for 4G wireless broadband applications.

***Revenue from the sale of products is recognized when the significant risks and rewards of ownership of the goods have passed to the buyer and when no continuing managerial involvement to the degree usually associated with ownership nor effective control over the sale of products is retained, which usually occurs on shipment of the goods. Products are not sold with a right of return but are covered by warranty.*** Although the products sold have embedded software, the Company believes that software is incidental to the products it sells.

14

(Emphasis added).

48.    These statements were materially false and misleading when made because: (a) Sequans recognized revenue while it maintained managerial involvement to the degree usually associated with ownership, (b) Sequans sold products with a right of return, and (c) the statements omitted that Sequans' revenue recognition practices violated IAS 18 by recognizing revenue where collectability is uncertain, and by recognizing revenue from sales subject to a right of return without being able to reasonably assess the amount of returns or reserving for such returns.

49.    The 2016 20-F also contained the following materially false and misleading statements regarding the Company's internal controls:

> Our management is responsible for establishing and maintaining adequate internal control over our financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, the company's principal executive and principal financial officers and effected by the company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS and includes those policies and procedures that:
>
> . . .
>
> - Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company . . .
>
> . . .
>
> Our management assessed the effectiveness of our internal control over financial reporting, as of December 31, 2016. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (2013 Framework).
>
> Based on our assessment, management believes that as of December 31, 2016 our internal control over financial reporting is effective based on these criteria.

50.     These statements were materially false and misleading when made because they omitted the following material information: (a) in violation of IFRS and IAS, Sequans recognized revenues from the module sales to Yifang without accruing any liability for anticipated returns or recording any expense after collection of receivables from those sales became uncertain; (b) Sequans had material weaknesses in the Company's internal controls over financial reporting; and, as a result (c) Sequans' financial statements did not comply with SEC Regulation 15D or the COSO internal control framework.

51.     On May 2, 2017, Sequans announced the Company's financial results for the first quarter of 2017, and made the following materially false and misleading statements regarding the Company's financial outlook for the second quarter of 2017:

> Sequans expects revenue for the second quarter of 2017 to be in the range of $13.5 to $15.5 million with non-IFRS gross margin above 40%. Based on this revenue range and expected gross margin, non-IFRS net loss per diluted share/ADS is expected to be between ($0.05) and ($0.07) for the second quarter of 2017, based on approximately 75.1 million weighted average number of diluted shares/ADSs. Non-IFRS EPS guidance excludes the impact of stock based compensation, the non-cash fair-value and effective interest adjustments related to the convertible debt and other financings, and any other relevant non-cash or non-recurring expenses.

52.     These statements were materially false and misleading when made because (a) Sequans omitted to disclose that it had to take a charge against revenue for at least $740,000 of improperly booked tablet-related module sales for which collection was not only uncertain but highly improbable; and as a result (b) by excluding the impact of a return of tablet-related modules and the expense from writing off uncertain receivables, the issued guidance was materially inflated and misleading.

**The Truth Emerges**

53.     On August 1, 2017, the Company announced the financial results for the second quarter of 2017 in a press release that stated in relevant part:

PARIS - August 1, 2017 - 4G chipmaker Sequans Communications S.A. (NYSE: SQNS) today announced financial results for the second quarter ended June 30, 2017.

Second Quarter 2017 Highlights:

Revenue: ***Revenue was $13.2 million, after a reduction of $740,000 related to a product return from an early 2016 tablet-related sale.*** Excluding the impact of the return, revenue would have been $14.0 million. Revenue for the second quarter of 2017 increased 6.3% compared to the first quarter of 2017 (12.3% without the impact of the return) and increased 33.7% compared to the second quarter of 2016 (41.2% without the impact of the return), reflecting increases in both product and other revenue.

(Emphasis added).

54.     On August 1, 2017, the Company also held a conference call to discuss the financial results for the second quarter of 2017. Defendant Karam stated the following regarding the reduction in revenue due to the product return:

On the negative side, we had an exceptional product return from an early 2016 sale related to our old tablet business which affected the optics of our results by reducing revenue by $740,000. Otherwise, we would have reported about $14 million, well within the range of our guidance and a 41% increase versus second quarter of 2016.

55.     On the August 1, 2017 earnings call, Defendant Choate provided further details about how improper accounting treatment for the tablet-related sale caused the Company's earnings miss and reduced revenue:

Our revenue was $13.2 million after giving effect to the accounting treatment related to a product return. Specifically in 2016, we were supplying tablets destined for Wal-Mart pursuant to firm purchase orders. When sales were disappointing, our customer could not pay and we spent a long time trying to find a solution. We were able to find another customer to use the product for a different application and they are currently completing their certification with Verizon. However, they were not able to commit for all of the units upfront, so ultimately we decided to take some of the product back into inventory until the new customer is ready for it.

Excluding the effect of this return, our total revenue would have been $740,000 higher or nearly $14 million and well within the range of our guidance.

17

56.     On this news, Sequans' ADR price declined by $0.67, or by over 18%, to close at $3.01 on August 1, 2017.

57.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant damages.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

58.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sequans securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sequans securities were actively traded on the NYSE. As of December 31, 2017, there were 154 holders of record registered with the depository of Sequans' ADRs in New York.  *See* January 17, 2018 Supplement to Prospectus dated December 22, 2017.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sequans or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sequans;

- whether the Individual Defendants caused Sequans to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Sequans securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

19

64.     Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sequans' securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiffs and members of the Class purchased, acquired and/or sold Sequans securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

65.     Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

66.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

67.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and

the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sequans' securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Sequans' securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation of Sequans' Annual Reports for 2015 and 2016 on Form 20-F filed on April 29, 2016 and March 31, 2017, respectively, as well as the materially false and misleading press release on the Company's financial outlook for the second quarter of 2017 issued on May 2, 2017.  Moreover, the Annual Reports for 2015 and 2016 were signed by Defendant Karam, and contained Defendant Karam's and Defendant Choate's signed certifications pursuant to SOX.  The Annual Reports for 2015 and 2016, and the May 2, 2017 press release were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sequans' finances and business prospects.

70.    By virtue of their positions at Sequans, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and

disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the CEO and CFO of Sequans, the Individual Defendants had knowledge of the details of Sequans' internal affairs.

72. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sequans. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sequans' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sequans' securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Sequans' business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Sequans securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73. During the Class Period, Sequans' securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sequans securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Sequans' securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of Sequans' securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and other Class members.

74.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

76.     Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

23

77.     During the Class Period, the Individual Defendants controlled the operation and management of Sequans, and conducted and participated, directly and indirectly, in the conduct of Sequans' business affairs.  As CEO and CFO, they knew the adverse non-public information about Sequans' misstatement of income and expenses and false financial statements.

78.     As officers (and in the case of Karam, a director) of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sequans' financial condition and results of operations, and to correct promptly any public statements issued by Sequans which had become materially false or misleading.

79.     Because of their positions of control and authority as CEO and CFO, the Individual Defendants were able to, and did, control the contents of the Annual Reports for 2015 and 2016 filed on April 29, 2016 and March 31, 2017, respectively, as well as the May 2, 2017 press release that Sequans disseminated in the marketplace during the Class Period concerning Sequans' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to culpably participate in the wrongful acts complained of herein.   Defendant Karam is a micromanager, who was deeply involved in the Company's day-to-day business, and he knew intricate details about the business better than anyone else at the Company, as confirmed by Sequans' Former VP.  According to him, Defendant Karam knew that there was a possibility Yifang may return the modules destined for Best Buy and Walmart, and delayed accepting the returns from Yifang to avoid recording a liability or expense.  As the CFO of Sequans, Defendant Choate was principally responsible for preparing Sequans' financial statements, and Sequans' Annual Reports from 2015 and 2016 contain her signed certifications pursuant to SOX.  The Individual Defendants therefore, were "controlling persons" of Sequans within the meaning of

Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sequans' securities.

80.     Each of the Individual Defendants, therefore, acted as a controlling person of Sequans.  By reason of their senior management positions and/or being directors of Sequans, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sequans to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Sequans and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

81.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sequans.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: April 9, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Omar Jafri*

**POMERANTZ LLP**
Patrick V. Dahlstrom
Joshua B. Silverman
Omar Jafri
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com
        jbsilverman@pomlaw.com
        ojafri@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Lawrence M. Rosen
Phillip Kim
Leah Heifetz-Li
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email:  lrosen@rosenlegal.com
        pkim@rosenlegal.com

Leah Heifetz-Li
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: lheifetz@rosenlegal.com

*Attorneys for Lead Plaintiffs*