UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x

IN RE SEQUANS
COMMUNICATIONS S.A.       **MEMORANDUM AND ORDER**
SECURITIES LITIGATION       Case No. 17-CV-4665 (FB) (SJB)

-------------------------------------------------x

| | |
|---|---|
| *Appearances:* | |
| *For the Plaintiffs:* | *For the Defendants:* |
| LAWRENCE M. ROSEN | JAMES N. KRAMER |
| PHILLIP KIM | Orrick Harrington & Sutcliffe LLP |
| The Rosen Law Firm, P.A. | 405 Howard Street |
| 275 Madison Avenue, 34th Floor | San Francisco, California 94105 |
| New York, New York 10016 | |
| | WILLIAM J. FOLEY |
| LEAH HEIFETZ-LI | Orrick Harrington & Sutcliffe LLP |
| The Rosen Law Firm, P.A. | 51 West 52nd Street |
| 101 Greenwood Avenue, Suite 440 | New York, New York 10019 |
| Jenkintown, Pennsylvania 19046 | |
| | |
| PATRIK V. DAHLSTROM | |
| JOSHUA B. SILVERMAN | |
| OMAR JAFRI | |
| 10 South La Salle Street, Suite 3505 | |
| Chicago, Illinois 60603 | |

**BLOCK, Senior District Judge:**

      The plaintiffs in this securities-fraud action claim that Sequans Communication S.A. ("Sequans"), along with two of its officers, knowingly made false statements in violation of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5. The defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the plaintiffs have not

adequately alleged falsity, scienter and loss causation. For the following reasons, the motion is granted in part and denied in part.

**I**

The following facts are taken from the amended complaint. For present purposes, the Court accepts them as true and draws all reasonable inferences in favor of the plaintiffs. *See Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019).

Sequans is a French company whose shares trade on the New York Stock Exchange. Its chief executive officer ("CEO") is Georges Karam. Its chief financial officer ("CFO") is Deborah Choate.

Sequans designs integrated circuit modules and supplies them to companies that manufacture cell phones and tablets. In early 2016 it "booked at least $740,000 in revenues for a large tablet-related sale" to Yifang, a Chinese company that was manufacturing tablets for sale to retailers such as Walmart and Best Buy. Am. Compl. ¶ 32. When those retailers cancelled their orders, Yifang reneged on the sale. Sequans agreed to accept the return of the unused modules and set about finding a new buyer for them "beginning at the end of the second quarter of 2016." Am. Compl. ¶ 36.

In the meantime, on June 30, 2016, and September 30, 2016, Sequans issued press releases regarding its earnings. The press releases did not note any reserves

2

or expense reflecting the return from Yifang.

Then, on March 31, 2017, Sequans filed an annual report with the SEC. The report stated in part that "[p]roducts are not sold with a right of return but are covered by warranty." Am. Compl. ¶ 46. It further stated that the company had internal controls in place to "[p]rovide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles." Am. Compl. ¶ 49. Karam and Choate each attested that, to the best of their knowledge, the information in the report was true and accurate.

Finally, on May 2, 2017, Sequans estimated that its revenue for the upcoming quarter would be "in the range of $13.5 to $15.5 million." Am. Compl. ¶ 51. The estimate did not mention the return from Yifang.

Sequans eventually found a buyer for the modules, but that buyer was unable to take immediate delivery. Thus, Sequans announced on August 1, 2017, that its revenue for the quarter was "$13.2 million, after a reduction of $740,000 related to a product return from an early 2016 tablet-related sale." Am. Compl. ¶ 53. By the end of that day's trading, Sequans's share price had fallen 18%. This lawsuit followed.

II

Section 10(b) of the Exchange Act makes it unlawful to use "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, prohibits making "any untrue statement of material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

"In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). The defendants argue that the plaintiffs have failed to adequately allege elements (1), (2), and (6). The Court addresses each in turn.

**A.     Falsity**

Plaintiffs' main theory of falsity is that the Yifang return belies the statement in Sequans's annual report that its products are not sold with a "right of return."

Am. Compl. ¶ 46. The factual dynamic described in the complaint sounds far more like an agreement negotiated after the fact than a "right" existing at the time of the sale.

Ultimately, however, the Court need not decide whether the facts alleged in the complaint support a reasonable inference that Yifang always had the right to return the modules. This is because plaintiffs further allege that the handling of the sale was inconsistent with Sequans's representation that it followed generally accepted accounting principles. As elaborated in the complaint, one of those principles is embodied in International Accounting Standard ("IAS") 18, which states that revenue from a sale of goods should be recognized when, *inter alia*, "it is probable that the economic benefits associated with the transaction will flow to the [seller]." Am. Compl. ¶ 23 (quoting IAS 18 ¶ 14). It further requires that, "when an uncertainty arises about the collectability of an amount already included in revenue, the uncollectible amount or the amount in respect of which recovery has ceased to be probable is recognized as an expense, rather than as an adjustment of the amount of revenue originally recognized." *Id.* ¶ 25 (quoting IAS 18 ¶ 18).

According to the complaint, Sequans began looking for a substitute buyer "beginning at the end of the second quarter of 2016." Am. Compl. ¶ 36. There is certainly a reasonable inference that it did so because the sale to Yifang had fallen

5

through by that point. Yet it did not book the return until August 2017. In the interim, leaving the revenue from sale on the books without accounting for the likelihood that it would not be collected was at least misleading.

**B.     Scienter**

It is possible, of course, that Sequans did not book the return until August 2017 due to inadvertence or an honest but mistaken belief that Yifang would follow through on the deal. Thus, the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The required state of mind for securities fraud is an intent to deceive or recklessness. *See ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 n.3 (2d Cir. 2007). "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 99.

The plaintiffs here rely on the second approach. The defendants argue that their allegations in that regard are "insufficiently particularized." Defs.' Mem. of Law at 10.

With respect to Karam, the Court disagrees. The complaint specifically alleges that Karam was personally involved in the attempt to find a new buyer for

6

the modules, "regularly" telling a former vice president of sales "to find another buyer for the modules sold to Yifang for the Best Buy tablets." Am. Compl. ¶ 36. That fact, if true, supports an inference that Karam was aware that the company could no longer rely on the original buyer for payment. And while there are undoubtedly arcane accounting principles, the principle that revenue from a sale should not remain on the books if the sale becomes uncertain is straightforward. *Cf. S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 482 (S.D.N.Y. 2008) ("[I]t does not require [specialized accounting] knowledge to know that the recognition of all the revenue for sales that were entirely contingent on further approval of the buyer was improper."). Since the plaintiffs have adequately alleged scienter as to Karam, Sequans's CEO, they have adequately alleged it as to Sequans itself. *See Teamsters Local 455 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise such an inference [of scienter] for a corporate defendant will be to plead it for an individual defendant.").

With respect to Choate, on the other hand, the complaint falls short. Her alleged involvement in the Yifang return amounts to a single statement she made on a conference call to investors after the return was announced: "When sales were disappointing, our customer could not pay and we spent a long time trying to find a

7

solution." Am. Compl. ¶ 55. At most, that statement shows that Choate was eventually made aware of the problem with Yifang; however, unlike Karam's alleged personal involvement in finding a new buyer, it does not support an inference that she then consciously hid the problem from investors. To the contrary, the complaint alleges that Karam stated that Choate should *not* be told because she "may object and prevent the Company from improperly delaying a major loss from quarter to the next." Am. Compl. ¶ 38. That allegation makes it even less likely that Choate had the necessary intent. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) ("A plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.").

**C.  Loss Causation**

"Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). To satisfy that element, a plaintiff must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

The plaintiffs allege that Sequans's share price fell significantly immediately

after the disclosure of the Yifang return in August 2017. The defendants respond that the return was actually first disclosed in a June 2017 report that "the Company entered into negotiations with a distributor for the return of 24,000 units sold to the distributor in 2016." Defs.' Mem. of Law at 19. Sequans's share price rose by five cents following that announcement.

As plaintiffs point out, the June 2017 report did not disclose the monetary value of the return or its impact on Sequans's revenue projections. The plaintiffs will eventually have to prove how a $750,000 shortfall caused such a dramatic drop in share price, but these competing theories raise issues of fact that cannot be resolved on a motion to dismiss. *Cf. Emergent Capital*, 343 F.3d at 197 (effect of intervening event on plaintiff's theory of loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss").

## III

For the foregoing reasons, the defendants' motion to dismiss is granted with respect to the claims against Choate and otherwise denied.

**SO ORDERED**.

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 30, 2019

9